## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| LEONARD BRONSTEIN, on Behalf of Himself and All Others Similarly Situated, | : : | CIVIL ACTION NO. 05- |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| MBNA CORP., BRUCE L. HAMMONDS; | : | DEMAND FOR JURY TRIAL |
| KENNETH A. VECCHIONE; RICHARD K. | : | |
| STRUTHERS; CHARLES C. KRULAK; | : | |
| JOHN R. COCHRAN, III; MICHAEL G. | : | |
| RHODES; LANCE L. WEAVER; and | : | |
| JOHN W. SCHEFLEN, | : | |
| | : | |
| Defendants. | : | |

## CLASS ACTION COMPLAINT FOR
## VIOLATIONS OF FEDERAL SECURITIES LAWS

Plaintiff has alleged the following based upon the investigation of plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by MBNA Corp. ("MBNA" or the "Company"), securities analysts reports about the Company, press releases issued by the Company, and media reports about the Company, and plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal class action on behalf of purchasers of the securities of MBNA between January 20, 2005 and April 21, 2005, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## **JURISDICTION AND VENUE**

2.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

3.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337 and Section 27 of the Exchange Act [15 U.S.C. §78aa].

4.    In connection with the acts alleged in this complaint defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

5.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information occurred in substantial part in this District. Additionally, defendants maintain their chief executive office and principal place of business within this District.

## **PARTIES**

6.    Plaintiff Leonard Bronstein, as set forth in the accompanying certification, incorporated by reference herein, purchased the common stock of MBNA during the Class Period and has been damaged thereby.

7.    Defendant MBNA is organized under the laws of Delaware and maintains its principal executive offices at 1100 North King Street, Wilmington, Delaware 19884. MBNA is the parent company of MBNA America Bank, N.A., a national bank. MBNA is also the

2

parent company of MBNA America (Delaware), N.A., a national bank. The Company is an international financial services company providing lending, deposit, and credit insurance products and services to its customers. The corporation is an issuer of endorsed credit cards, marketed primarily to members of associations and customers of financial institutions and other organizations. In addition to its credit card lending, MBNA makes other consumer loans, as well as commercial loans primarily to small businesses. MBNA conducts its business in the United Kingdom, Ireland and Spain through MBNA Europe, and in Canada through MBNA Canada.

8.    Defendant Bruce L. Hammonds ("Hammonds") is Chief Executive Officer ("CEO"), President and a director of MBNA. Prior to assuming these positions on December 30, 2003, Hammonds served as Chairman and CEO, and prior thereto as Chief Operating Officer of MBNA. Hammonds has been a director of MBNA since 1986. During the Class Period, Hammonds sold more than $9 million worth of his MBNA stock. For the 2004 year, Hammonds earned $17.4 million in total compensation.

9.    Defendant Kenneth A. Vecchione ("Vecchione") was Vice Chairman and Chief Financial Officer ("CFO") of MBNA and CFO of MBNA America Bank. Vecchione has been a director of MBNA America since January 2005 and also serves as CFO of MBNA Delaware. Vecchione spoke at the February 9, 2005 CSFB investor conference. During the Class Period, Vecchione sold more than $2.6 million worth of his MBNA stock.

10.    Defendant Richard K. Struthers ("Struthers") was Vice Chairman of MBNA and MBNA America. Struthers is also a director and serves as Chief Loan Officer of MBNA America, as well as Chairman of MBNA Europe and MBNA Canada. In addition, Struthers

3

is a director and serves as Chairman and Chief Executive Officer of MBNA Delaware. During the Class Period, Struthers sold more than $12 million worth of his MBNA stock.

11.    Defendant Charles C. Krulak ("Krulak") was Vice Chairman of MBNA and MBNA America. During the Class Period, Krulak sold more than $13 million worth of his MBNA stock.

12.    Defendant John R. Cochran, III ("Cochran") was the Chief Operating Officer of MBNA and is the Chairman, Chief Executive Officer and President of MBNA America. Cochran has been a director of MBNA America since 1986. During the Class Period, Cochran sold more than $14 million worth of his MBNA stock.

13.    Defendant Michael G. Rhodes ("Rhodes") was Group Executive for the U.S. Credit Card Business Development division of MBNA. Rhodes spoke at the February 9, 2005 CSFB investor conference. During the Class Period, Rhodes sold more than $10.8 million worth of his MBNA stock.

14.    Defendant Lance L. Weaver ("Weaver") was Vice Chairman of MBNA and MBNA America. Weaver is also a director of MBNA America. Weaver has been a director of MBNA America since 1993. During the Class Period, Weaver sold more than $10 million worth of his MBNA stock.

15.    Defendant John W. Scheflen ("Scheflen") was Vice Chairman of MBNA America. Scheflen also serves as Secretary of MBNA and MBNA America. During the Class Period, Scheflen sold more than $3.3 million worth of his MBNA stock.

16.    During the Class Period, the defendants, because of their positions as the senior executive officers and Chairmen of MBNA, were privy to confidential and proprietary information concerning MBNA, its operations, finances, financial condition, present and

4

future business prospects. Consequently, they had access to material adverse non-public information concerning MBNA via, inter alia, access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

17.    Each defendant is liable as a direct participant in, and a co-conspirator with respect to the wrongs complained of herein.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

18.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons who purchased the securities of MBNA between January 20, 2005 to April 21, 2005, inclusive (the "Class Period") and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

19.    The members of the Class are so numerous that joinder of all members is impracticable. MBNA has more than 1.27 billion shares of common stock outstanding, which were actively traded on the NYSE throughout the Class Period. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of

members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by MBNA, its underwriters or its transfer agent and may be notified of the pendency of this action by mail using the form of notice similar to that customarily used in securities class actions.

20.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

21.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

22.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business and operations of MBNA; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

23.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively

small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

24.     On January 20, 2005, MBNA issued a press release entitled "MBNA Reports Fourth Quarter Earnings of $.59 per Common Share – Increases Dividend 17% to $.56 Per Common Share – Announces New $2 billion Common Stock Repurchase Program." Defendants announced that MBNA had reduced no-interest introductory rate offerings to 10% of the 30 million to 40 million credit card promotions it mails out each month, down from 40% in January 2004. Defendants also reported a 9% rise in Q4 2004 net income (15% for the year), that charge-offs dropped 18 basis points to 4.43%, that the Q4 2004 delinquency rate declined to 4.13% of loans outstanding from 4.39% in Q4 2003, that loans grew 3% to $121.6 billion, that the Company was raising its dividend by over 17% and that its Board had approved a buyback of up to $2 billion in stock (or 6% of the outstanding shares). Also on January 20, 2005, MBNA announced it will take a one time restructuring charge in the first quarter of 2005 as a result of the initiation of a voluntary early retirement program and a voluntary employee severance plan program. The Company expected this restructuring charge to total approximately $300 to $350 million pre-tax and result in an anticipated pre-tax expense savings of approximately $150 million in 2005 and $200 million in 2006. The Company announced at the end of the voluntary early retirement and severance program in March 2005 it would undertake a review of its operations and look for opportunities to consolidate some of its facilities.

7

25.    On January 21, 2005, Hammonds, Vecchione, Cochran and the entire executive committee held an earnings conference call during which MBNA have earnings guidance for the first time in its history. Defendants explained that MBNA would offset any higher marketing spending with entirely voluntary 3% staff reductions. Defendants stated that MBNA would increase earnings by increasing its margins by lowering reliance on the less profitable no-interest card offerings, and explained that the Company's delinquency and loss rates would decrease, stating:

> Losses were 4.43 percent for the quarter, down 18 basis points for the third quarter, and down 54 basis points year over year. And delinquency was 413, and our losses continue to come down, at 413, delinquency is a very, very good year end delinquency rates, and **as we look out**, it would seem to us that **delinquency and losses should continue to decrease**.

26.    Defendants continued:

> We expect earnings growth to average about 12 percent over the next several years.... We expect it to [sic] the 10 percent this year primarily because we're starting the year off at a relatively low level of average growth. This, again, is a result of slow industry growth and our pullback on zero percent marketing.

> As the year progresses, we expect asset growth to pick up....

                    *    *    *

> Our 2005 EPS is $2.36, a 10% increase over 2004. We expect, in 2005, moderate loan growth, supported by strong retail growth and lower cash volume. We expect the risk-adjusted net interest margin to expand. Net interest martin will remain stable and we will see improving loan loss rates. Operating income growth will be in line with loan growth....

> Expenses will grow significantly slower than loan growth and we look for low single-digit growth.... The effective tax rates should return back to historical levels and we will use enhanced capital management programs, if necessary, to support our $2.26 EPS goal.

                    *    *    *

**And we feel confident that we will continue to deliver consistent, profitable growth well into the future**....

27.    On January 25, 2005, analyst Matthew Park at A.G. Edwards increased his investment rating on MBNA's stock to "buy" from "hold," saying he came away from MBNA's January 21, 2005 earnings conference encouraged about MBNA's future profitability.

28.    Immediately thereafter, certain of the individual defendants began rapidly selling almost $76 million worth of the Company's stock into the markets as follows:

| DATE | DEFENDANT | SHARES SOLD | PRICE | GROSS PROCEEDS |
|------|-----------|-------------|-------|----------------|
| 01/25/05 | Rhodes | 406,040 | $26.76 | $10,865,630 |
| | Weaver | 376,835 | $26.76 | $10,084,105 |
| | Krulak | 130,000 | $26.61 | $3,459,300 |
| | Scheflen | 125,810 | $26.85 | $3,377,999 |
| | Vecchione | 79,829 | $26.70 | $2,131,434 |
| | | 20,633 | $26.80 | $552,964 |
| 01/27/05 | Cochran | 398,150 | $26.51 | $10,554,957 |
| | | 133,009 | $26.55 | $3,531,389 |
| 01/27/05 | Hammonds | 351,409 | $26.51 | $9,315,853 |
| 01/31/05 | Krulak | 92,483 | $26.50 | $2,450,800 |
| 02/01/05 | Krulak | 224,754 | $26.75 | $6,012,170 |
| | | 50,217 | $27.00 | $1,355,859 |
| 02/03/05 | Struthers | 457,464 | $26.84 | $12,278,334 |
| | | 2,846,633 | | $75,970,792 |

29. On February 9, 2005, defendants appeared at a Credit Suisse First Boston ("CSFB") investor conference to discuss the Company's Q4 2004 results and future expectations. During the conference, defendants admitted that the Company was seeing "slowing growth" in its "core product," credit card interest revenues, but stated that another trend the Company was then experiencing, growing "ROMA" or "Return on Managed Assets," would counter the lack of growth and increase the Company's revenues and earnings. Defendants once again stated MBNA would achieve 12% average annual EPS growth – with 10% in 2005 – and a 20%+ increase on Return of Equity.

30. On April 21, 2005, MBNA shocked the market, issuing a press release entitled "MBNA Reports Earnings Per Common Share of $.02, Including the Impact of the Previously Announced Restructuring Plan." The press release stated, inter alia:

[N]et income for the first quarter of 2005 was $31.7 million or $.02 per common share compared with $519.7 million or $.40 per common share for the first quarter of 2004 *[and $0.59 per share in Q4 2004]*. Net income in the first quarter of 2005 includes a restructuring charge of $767.6 million pre-tax *[double the $300-$350 million stated on January 21, 2005]*. Without the restructuring charge, net income was $514.1 million or $.40 per common share.

In addition to the restructuring charge, the Corporation's results were further impacted by unexpectedly high payment volumes from U.S. credit card customers. The higher payments reduced managed loans in the quarter more than in prior years. Additionally, the payment volumes were particularly higher on accounts with higher interest rates, which adversely impacted the Corporation's yield on managed loans.

As a result of these recent trends, in the revaluation of its interest-only strip receivable, the Corporation projected lower excess spreads and higher payments. This reduced the interest-only strip receivable and resulted in a net loss from securitization activity of $206.6 million. The net loss from securitization activity is included in other operating income and caused the Corporation's first quarter 2005 other operating income to be lower than its first quarter 2004 other operating income.

10

The Corporation is implementing programs to offset the higher payment rates in the U.S. Card business. "It is a difficult environment right now. However, we've made progress on recent product introductions, diversification strategies, and improvements in credit quality and operating efficiency," said Bruce L. Hammonds, MBNA's Chief Executive Officer.

Based on the first quarter results and trends, management believes that MBNA's 2005 earnings per share will be significantly below its 10% growth objective.

Loan receivables at March 31, 2005 were $31.8 billion, an increase of $1.8 billion over the first quarter of 2004 [but a decrease from the $33.8 billion at December 31, 2004]. Total managed loans at March 31, 2005 were $116.6 billion, a decrease of $1.0 billion compared to the first quarter of 2004 [down from $121.6 billion at December 31, 2004]. Total volume in the quarter rose to $49.3 billion, an increase of 5% over the first quarter of 2004. Total volume includes sales volume of $33.3 billion, which increased by 10% over the first quarter of 2004, and cash advance volume of $16.0 billion, which decreased by 5% from the first quarter of 2004.

Losses on loan receivables and managed loans for the first quarter of 2005 were 3.98% and 4.48%, respectively [up from 3.74% and 4.43% respectively in the Q4 2004]. Delinquency on loan receivables and managed loans was 2.93% and 4.17%, respectively, at March 31, 2005 [with delinquency on managed loans up from 4.13% in the Q4 2004]. Based on improving asset quality trends, the provision for possible credit losses was $77.9 million lower in the first quarter of 2005 than in the first quarter of 2004.

The Corporation's other operating expense in the first quarter of 2005 was $2.1 billion, including the restructuring charge. The Corporation's focus on improved operating efficiency has generated better results than anticipated, and other operating expense, excluding the restructuring charge in the first quarter of 2005, was lower than in the first quarter of 2004 by 6%. In addition, during the first quarter the Corporation repurchased approximately $250 million of common stock pursuant to its $2 billion share repurchase program announced in January 2005.

    31.    The true facts, which were known by each of the defendants but concealed from the investing public during the Class Period, were:

    (a)    MBNA had been experiencing "unexpectedly high payment volumes from U.S. credit card customers" during the Q1 2005, reducing managed loans in the

quarter "more than in prior years," and causing loan receivables to decrease by $2 billion to $31.8 billion during Q1 2005 from $33.8 billion reported at the end of Q1 2004;

(b)    Of the pre-pays, the higher interest rate borrowers were prepaying more than the lower interest rate borrowers, resulting in the prepays having a more adverse impact on the MBNA's yield on managed loans;

(c)    MBNA was suffering from a unseasonably sharp contraction in loans during Q1 2005 causing total managed loans to decrease by $5 billion to $116.6 billion from $121.6 billion at the end of Q1 2004;

(d)    MBNA had been aggressively recognizing gains on sales of securitized no-interest loan receivables through off-balance sheet funding structures;

(e)    MBNA was experiencing higher-than-expected delinquencies during the Q1 2005, increasing to 4.17% from 4.13% at the end of Q4 2004;

(f)    MBNA had completely reversed its margin-protection strategy of reducing reliance on no-interest loans and was instead increasing its offering of no-interest loans, which will significantly reduce future earnings;

(g)    Losses on loan receivables and managed loans had increased to 3.98% and 4.48%, respectively, up from 3.74% and 4.43% respectively in the Q4 2004;

(i)    Due to the increase in pre-pays, the interest-only securitization strips valued on the Company's books at $1.3 billion were overstated by 16^, or $27 million ($0.10 per share); and

(j)    The Company's previously announced Q1 2005 restructuring charge had doubled to $767.6 million ($0.38 per share) from the $300-$350 million announced on January 21, 2005.

12

32.     Following the Company's April 21, 2005 disclosures, the Company's stock price dropped from its closing price of $23.11 on the close of April 20, 2005 to below $19 per share on extremely high trading volume of 51 million shares.

33.     On April 28, 2005, the Company announced that its debt offering would be increased by over one-third – from $500 million to $750 million – significantly increasing the Company's borrowing costs.

34.     Also on April 28, 2005, Legg Mason issued an analyst report entitled "Consumer Financial – I/O Strip Issue Appears MBNA0-Specific." In its report, Legg Mason stated that "in our view, the weakness at MBNA is more fundamentally-related and company-specific. With [Capital One] already reporting solid 1Q05 results (and no significant I/O strip writedown) and similarly-strong results expected from [Providian Financial Corp.], we doubt either is at risk." Legg Mason also reported that "we believe [Capital One] and [Providian] have taken more conservative approaches to gain on sale recognition in the past, limiting the potential for writedowns on weaker-than-expected trends in the future."

35.     Defendants acted with scienter in that defendants knew that the public statements or documents issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

36.     Defendants were motivated to commit the fraud alleged herein so that they could sell their personal shares as alleged in ¶28.

13

### Undisclosed Adverse Information

37.    The market for MBNA's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, MBNA's securities traded at artificially inflated prices during the Class Period. The artificial inflation continued until the time the market digested the truth regarding MBNA's financial and operating condition. Plaintiff and other members of the Class purchased MBNA securities relying upon the integrity of the market price of the Company's securities and market information relating to MBNA and have been damaged thereby.

38.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of MBNA securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as alleged herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as detailed herein.

39.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about MBNA. These material misstatements and omissions created in the market an unrealistically positive assessment of MBNA and its prospects and operations, thus causing the Company's securities to be

14

overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's common stock and securities at artificially inflated prices, thus leading to their losses when the illusion was revealed, and the market was able to accurately value the Company.

### Applicability Of Presumption Of Reliance:
### Fraud-On-The-Market Doctrine

40.    At all relevant times, the market for the common stock of MBNA's securities was an efficient market for the following reasons, among others:

(a)    MBNA's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient market;

(b)    As a regulated issuer, MBNA filed periodic public reports with the SEC and the NYSE;

(c)    MBNA regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    MBNA was followed by securities analysts employed by brokerage firms who wrote reports which entered the market.

41.    As a result of the foregoing, the market for MBNA's securities promptly digested current information regarding MBNA from all publicly available sources and reflected such information in the prices for MBNA securities. Under these circumstances,

15

all purchasers of MBNA's securities during the Class Period suffered similar injury and a presumption of reliance applies.

## NO SAFE HARBOR

42.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of MBNA who knew that those statements were false when made.

## FIRST CLAIM

### Violation Of Section 10(b) Of
### The Exchange Act And Rule 10b-5
### Promulgated Thereunder Against All Defendants

43.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

43.     During the Class Period, defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period,

16

did: (i) deceive the investing public, including plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of MBNA's securities; and (iii) cause plaintiff and other members of the Class to purchase MBNA's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

44.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for MBNA's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

45.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of MBNA as specified herein.

46.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of MBNA's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about MBNA and its

17

business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of MBNA's securities during the Class Period.

47.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

48.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of MBNA's securities was artificially inflated throughout the Class Period. In ignorance of the fact that market prices of MBNA's securities were artificially inflated, and relying directly or indirectly on the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period. Plaintiff and the other members of the Class acquired MBNA securities during the Class Period at artificially high prices and were damaged thereby.

49.    At the time of said misrepresentations and omissions, plaintiff and the other members of the class were ignorant of their falsity, and believed them to be true. Had plaintiff and the other members of the Class and the marketplace known of the true financial condition and business prospects of MBNA, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their MBNA securities, or, if they had acquired such securities during

18

the Class Period, they would not have done so at the artificially inflated prices which they paid.

50.     By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

51.     As a direct and proximate result of defendants' wrongful conduct plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**WHEREFORE**, plaintiff prays for relief and judgment as follows:

(a)     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

(b)     Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated: May 13, 2005

Respectfully submitted,

**ROSENTHAL, MONHAIT, GROSS &
     GODDESS, P.A.**
**BY:**


**JOSEPH A. ROSENTHAL (No. 234)**
**JEFFREY S. GODDESS (No. 630)**
919 Market Street, Suite 1401
Wilmington, DE 19801
Telephone: 302-656-4433
Fax: 302-658-7567

**LAW OFFICES BERNARD M. GROSS, P.C.**
**DEBORAH R. GROSS**
**ROBERT P. FRUTKIN**
Suite 450, Wanamaker Building
Juniper and Market Street
Philadelphia, PA 19107
Telephone: 215-561-3600
Fax: 215-561-3000

**JAMES M. ORMAN, ATTORNEY AT LAW**
**JAMES M. ORMAN**
1845 Walnut Street, 14th Floor
Philadelphia, PA 19103
Telephone: 215-523-7800
Fax: 215-523-9290

Attorneys for Plaintiff

20

LAW OFFICES BERNARD M. GROSS, P.C.

## AFFIDAVIT OF

1.     I, Leonard Bronstein, have reviewed the Complaint and have authorized the filing of same;

2.     I did not purchase the common stock of MBNA Corp. at the direction of counsel or in order to participate in any private action arising under this title;

3.     I am willing to serve as a class representative and provide testimony at deposition and trial if necessary;

4.     My transaction(s) in MBNA Corp. common stock during the time period from January 20, 2005 through and including April 21, 2005, inclusive, are set forth below:

| Date | Purchase(s) or Sales(s) | Amount | Price |
|------|-------------------------|--------|-------|
| 03/23/05 | Purchased | 30 shares | $24.49 |

5.     During the previous three years, I have not been a lead plaintiff in any securities fraud class actions.

6.     I will not accept any payment for serving as a class representative beyond my pro rata share of any recovery, except as ordered or approved by the Court with respect to an award for reasonable costs and expenses (including lost wages).

I declare under penalty of perjury that the foregoing is true and correct. Executed this 10TH day of MAY , 2005, at WILMINGTON, DE .(city/state)

LEONARD BRONSTEIN